# IN THE COURT OF APPEALS OF IOWA

No. 22-0221
Filed November 17, 2022

**IN RE THE MARRIAGE OF HEATHER ANN BANISTER
AND SHAUN IVAN BANISTER**

**Upon the Petition of
HEATHER ANN BANISTER,**
    Petitioner-Appellant,

**And Concerning
SHAUN IVAN BANISTER,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Lyon County, Shayne Mayer, Judge.

Heather Banister appeals a dissolution-of-marriage decree. **AFFIRMED AS MODIFIED AND REMANDED.**

Missy J. Clabaugh, Sioux Center,  for appellant.

Matthew T. E. Early of Matthew Early Law Office, Spirit Lake, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**BADDING, Judge.**

Heather Banister, a former stay-at-home mother of three children, appeals the decree dissolving her marriage to Shaun Banister. At the trial on her petition, Shaun complained that he had not gotten "a sniff of a win since this whole thing started." So to be "fair with the property division and with the kids," he asked for everything to be split "down the middle," children included. The district court went along with Shaun's request and placed the children in the parties' joint legal custody and physical care. On appeal, Heather challenges that decision, along with the court's division of the parties' property and treatment of attorney fees.

**I.      Background Facts and Proceedings**

Shaun is a native of New Mexico, while Heather grew up in Iowa, where her family still lives. The parties met in August 2014 when Shaun was working on the road in Sanborn, Iowa on a wind turbine project. They began living together about three months later, soon after Heather found out she was pregnant with the couple's first child. When the parties met, Shaun's employment in the wind turbine industry required him to work long hours. Heather had a teaching degree, but because she could not find full-time employment in that field, she supplemented her substitute teaching jobs with work in flooring sales. The parties' relationship from there is a tale of travels, with frequent moves driven by Shaun's work. From the fall of 2014 through the spring of 2015, the parties lived together in Texas, where Shaun went for turbine work during the offseason in Iowa.

The parties moved back to Sanborn in March 2015 and remained there until November 2016. After the parties' first child was born in June 2015, Heather

stayed home to care for him, while Shaun continued to work long hours away from home.  The parties married in February 2016.

After their marriage, the parties moved to Carlsbad, New Mexico for the winter months between November 2016 and March 2017.  While there, Shaun worked odd jobs for his uncle Melvin, and Heather stayed home with the child.  According to Heather, even though Shaun's work schedule during this time was much less demanding than when he worked with wind turbines, their parenting roles did not change.  Heather continued to provide most of the care for the parties' child with little involvement from Shaun.

The parties returned to Iowa and lived in Ames from April to July 2017.  Their second child was born shortly after the move to Ames.  While there, Shaun returned to his work with wind turbines, which again involved long hours.  During the first month following their return to Iowa, Shaun lived in his boss's camper and would only visit Heather and the children on weekends.

In July 2017, the parties moved to Humboldt, where they remained until April 2019.  Though they were back to living together, Shaun was still minimally involved with the children, preferring to let Heather do most of the caretaking.  The goal, according to Shaun, was for him "to work ungodly hours, save up as much money as possible, and build a house" in New Mexico.  To that end, the parties bought a lot in New Mexico from Shaun's uncle Melvin.  From April through October 2019, Heather and the children lived with Heather's sister in Rock Rapids, Iowa, while Shaun lived in an RV he used to travel between job sites.  He typically visited Heather and the children every other weekend.

In October 2019, the parties began renting a house in Rock Rapids. By then, the marriage was "pretty rocky." The couple's third child was born in January 2020. Just a few months later, they were discussing divorce. Yet in April, Heather agreed to move back to Carlsbad with Shaun in a final effort to save the marriage. The impetus for the move was the sale of a heating-and-cooling business in New Mexico once owned by Shaun's uncle, Melvin. The parties purchased the business on July 1, though Shaun took over managerial duties of the business soon after the family moved to Carlsbad. Shaun felt it was the right time to make this change because the wind turbine business was slowing down. It also dovetailed with the parties' plan to build a home in New Mexico. Shaun explained:

> [T]he whole point of me going down there was to be with family and to get off the road, quit building wind turbines and try to be home a little more even though I knew and I told her at the start it's going to be tough. It's going to take a little time to get the thing out of the hole and I would be busy.

The purchase price for the business was $100,000.00, with $50,000.00 due at closing, $25,000.00 by October 1, 2020, and another $25,000.00 by January 1, 2021. The parties borrowed the initial $50,000.00 from Shaun's uncle. They then deposited $75,000.00 from their personal account into the business account to get the business going, which took considerable work on Shaun's part. To pull the business "out of the gutter," Shaun was working from "sun up until sun down." He was "trying to bid jobs, sell jobs, run the crane, run the crews, order equipment, do inventory, keep the lights on, pay the bills." In the midst of this scramble, Heather

and the children left Carlsbad on July 7 and returned to Rock Rapids,[1] where they began living with Heather's parents. Heather told Shaun she was just taking the children to Iowa for a visit, but within a day or two of her arrival there, she filed for divorce. She then obtained a job at a dentist's office, where she works thirty-two hours per week, and enrolled the children in daycare and school.

Shaun remained in Carlsbad until December 2020, when he moved to Larchwood, Iowa to be closer to the children. He began renting a house and obtained employment with a local heating-and-cooling company. In Shaun's absence, his uncle Melvin agreed to run the business in New Mexico until it could be sold. Melvin looked for buyers before eventually agreeing to purchase the business himself for $75,000.00. The sale was completed at the end of December 2020, with Melvin forgiving the $50,000.00 he had loaned the parties and paying Shaun $25,000.00. Although not specified in the purchase agreement, Melvin said he also waived $62,500.00 due to him in lease payments for the building housing the business. Shaun testified that selling to Melvin was pretty much his only option. Melvin agreed, testifying: "If I hadn't stepped in, there would be no business, period." But within days after Melvin bought the business, he turned around and sold it to a company from Roswell, New Mexico for $125,000.00.

Following a hearing on temporary matters in mid-December, the court placed the parties' children in their joint legal custody, with physical care to Heather. Given her role as the historic "primary caregiver" of the children, the court

---

[1] The district court denied Shaun's motion to dismiss the dissolution petition for lack of jurisdiction after crediting Heather's testimony that she moved to New Mexico on a conditional basis and returned to Iowa within five months.

concluded that "[a] shared care arrangement would be too much of a change for the children's mental, emotional and physical health." Shaun had the children in his care every other weekend from Friday evening to Sunday evening and every Wednesday overnight. With this parenting schedule, and his less demanding job, Shaun became a more involved father. He testified this was an "eye-opening" experience for him: "[I]t's gotten a lot better now. I never had to do—it's kind of like if you didn't know how to ride a bike. You're not just going to jump on and ride a bike. You've got to crash a few times." Heather agreed "Shaun has definitely taken on a different role as father of the children since he . . . relocated back to Iowa."

The case proceeded to trial over three days in April and May 2021. The primary issues were the parties' competing requests on physical care—with Heather wanting physical care and Shaun seeking joint physical care—and distribution of the marital estate. Heather's case for physical care focused on her role as primary caregiver of the children, Shaun's claimed overbearing personality, and communication problems between the parties. For his part, Shaun acknowledged Heather was the primary caregiver during the marriage, but he contended that since their separation, "everything is totally different. . . . She's working as well. I mean, basically the daycare is raising the little ones and the school is raising" the oldest.

In its decree, the district court acknowledged that during the marriage, Heather was the primary caregiver, with Shaun working long hours, often away from home. But the court found that since Shaun's return to Iowa in December 2020, he

has been an involved parent who loves his children. He has exercised all the visitation awarded to him as well as any additional time offered by Heather, has become involved in the children's activities such as dance, and has pursued a job that allows him to be present for his children.

The court also found each party's home was appropriate; the children are bonded to both of them; and each can "provide for the emotional, social, moral, material and educational needs of the children." As to Heather's allegations of conflict and inability to communicate, the court found the parties' communications to be nothing more than "indicative of a couple going through a divorce." So the court granted Shaun's request for joint physical care on an alternating two-day, two-day, three-day basis.

Turning to the division of property, the court largely rejected Heather's claims that Shaun dissipated marital assets. Her claims focused on the sale of the business for less than its purchase price; Shaun's decision to liquidate a 401(k) retirement account; and $53,860.33 in cash withdrawals and advances, unexplained checks, and excessive spending on Shaun's credit cards since their separation.[2] When confronted with these latter expenditures, Shaun argued that most were from his move to Iowa and necessary living expenses.

On the sale of the business, the court found Heather presented "no evidence on whether or not there would have been a better purchase price" when it was sold. For the $7946.26 in penalties incurred when Shaun cashed in his 401(k) retirement account, the court found it fair that Heather should share in that

---

[2] Heather also complained about $2991.15 that Shaun spent on "unreasonable cost insurance despite being informed the children already had Medicaid/Title 19 at no cost," bringing her dissipation total to $56,851.48. But she does not include the claimed unnecessary health insurance cost in her arguments on appeal.

liability since she got one-half of the proceeds.[3] The court agreed with Heather that Shaun had dissipated $6000.00 in money he gambled at a casino. As for the rest of the money Heather claimed Shaun squandered, the court only specifically addressed Shaun's purchase of new furniture for his residence in Iowa, which it concluded was not dissipation because he "will be paying for those assets" by "taking on as debt, the credit card that was used" for the purchase. The court then awarded each of the parties any personal property in their possession, but assigned values only for their vehicles, guns, Heather's camera, Shaun's tools, and personal property located in New Mexico to be split by the parties. Finally, the court declined to include a $10,772.70 loan from Heather's father for her attorney fees as a debt to her, although the court did include $10,000.00 in attorney fees that Shaun charged to his credit card shortly before trial. Each party was then ordered to pay their own attorney fees.

Heather moved to reconsider, enlarge, or amend. Among other things, she complained about the court's handling of the parties' debts for their attorney fees. She also complained that the court did not include "all of the household and personal property Shaun acquired following separation" as assets to Shaun even though it included debts for those assets on Shaun's side of the balance sheet. The court denied Heather's motion as to each of these items.

Heather appeals, claiming (1) the court should have placed the children in her physical care rather than in the parties' joint physical care; (2) the division of

---

[3] The account was valued at $31,250.84 with a surrender value of $23,838.81. After Shaun cashed it out, he cut Heather a check for one-half of the surrender value.

marital assets was inequitable because it did not properly account for (a) Shaun's sale of the business for below fair market value, (b) "dissipation of other assets," including Shaun's unexplained and unnecessary cash withdrawals, credit card charges, and the penalties incurred from Shaun's liquidation of his 401(k), (c) the value of property Shaun purchased when he moved to Iowa, and (d) debt associated with attorney fees; and (3) the court abused its discretion in denying her request for an award of attorney fees.

## II. Standard of Review

Our review of dissolution proceedings is de novo. Iowa R. App. P. 6.907; *see also In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g); *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007).

## III. Analysis

### A. Physical Care

We begin with Heather's claim that the district court should have placed the children in her physical care. She emphasizes her role as the historical caregiver of the children and submits the parties' inability to effectively communicate, the degree of conflict between them, and their "inability to see eye-to-eye on child related issues" weigh against joint physical care.

Where, as here, "joint legal custody is awarded to both parents, the court may award joint physical care to both joint custodial parents upon the request of either parent." Iowa Code § 598.41(5)(a) (2020). "The objective of a physical care determination is to place the children in the environment most likely to bring them

to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Generally, courts consider the factors in Iowa Code section 598.41(3) and *In re Marriage of Winter*, 233 N.W.2d 165, 166–67 (Iowa 1974), when reaching physical care decisions.[4] Courts consider the following nonexclusive factors in determining whether a joint-physical-care arrangement is in the best interests of children:

> (1) "approximation"—what has been the historical care giving arrangement for the child[ren] between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (quoting *Hansen*, 733 N.W.2d at 697–99). "Any consideration of joint physical care, however, must still be based on Iowa's traditional and statutorily required child custody standard—the best interest of the child." *Hansen*, 733 N.W.2d at 695.

The first factor clearly weighs in Heather's favor. Before the parties separated in July 2020, Shaun had little involvement with the children. For several extended periods when he was working out of town, Shaun's contact with the children was limited to visits every other weekend. And even when he wasn't working, Shaun agreed his parenting consisted of "wrestling with [the children] on the floor, playing with them." He explained, "When they're tiny, I mean, how many

---

[4] "The factors the court considers in awarding custody are enumerated in Iowa Code section 598.41(3)." *In re Marriage of Courtade*, 560 N.W.2d 36, 37 (Iowa Ct. App. 1996). "Although Iowa Code section 598.41(3) does not directly apply to *physical care* decisions, . . . the factors listed here as well as other facts and circumstances are relevant in determining" physical care. *Hansen*, 733 N.W.2d at 696. While the statutory factors are relevant considerations, Heather focuses her argument on the *Hansen* factors.

men do you see just, oh, holding them all day?" In an affidavit submitted to the court for the temporary hearing,[5] Shaun said, "There were times that I felt I needed to be left alone, and I felt Heather was intentionally pushing the children on me." As a stay-at-home mom, Heather handled pretty much every aspect of the children's care. She testified that "even on the weekends when [Shaun] was home, he had the ability to turn that parent[ing] on or off . . . when he felt like it," while she "never shut it on and off." Shaun's involvement only increased during the few months between his return to Iowa in December 2020 and trial in April and May 2021.

So the question is, how heavily should the approximation factor weigh in Heather's favor? "In considering whether to award joint physical care where there are two suitable parents," as we have here, "stability and continuity of caregiving have traditionally been primary factors." *Id.* Those factors, which are expressed in terms of the approximation rule, "tend to favor a spouse who, prior to divorce, was primarily responsible for physical care." *Id.* This is because "successful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality." *Id.* at 697. Past caretaking patterns are also "a fairly reliable proxy of the intangible qualities such as parental abilities and emotional bonds that are so difficult for courts to ascertain." *Id.* at 696 (citation omitted). "While no post-divorce physical care arrangement will be identical to predissolution experience, preservation of the greatest amount of stability possible is a desirable goal." *Id.* at 696–97.

---

[5] The parties asked the court to take judicial notice of the entire file, specifically including the affidavits they submitted for the temporary hearing.

Our supreme court in *Hansen* recognized there may be circumstances that "outweigh considerations of stability, continuity, and approximation," like where "a primary caregiver has abandoned responsibilities or had not been adequately performing his or her responsibilities because of alcohol or substance abuse." *Id.* at 697. There are no such circumstances present here. Indeed, even when Shaun became more involved with the children after moving to Iowa, he still left certain caretaking duties to Heather. For instance, when asked about his oldest child's education, Shaun testified, "I know [Heather] loves going through [homework]. . . . That's kind of her thing. Just like scheduling birthday parties or whatever." As for other caretaking duties, like disciplining the children or implementing their nap schedule, Shaun said that he was still "learning" and trying to follow Heather's lead.

While that's good, we are not concerned with whether Shaun can learn these parenting skills but whether the children should be placed in a caretaking arrangement that is significantly different from what they are used to. *See In re Marriage of Arnold*, No. 08-1103, 2009 WL 779041, at *3 (Iowa Ct. App. Mar. 26, 2009) ("[T]he factors of stability and continuity of caregiving focus on the caretaking arrangement *prior to* the parties' separation." (emphasis added)). Our cases tell us they should not, all other things being equal. *See Hansen*, 733 N.W.2d at 697 ("In contrast, imposing a new physical care arrangement on children that significantly contrasts from their past experience can be unsettling, cause serious emotional harm, and thus not be in the child's best interest."). And here, all other things were not equal.

Much of the evidence at trial focused on what Heather argued was the parties' inability to communicate and show mutual respect, as well as the degree

of conflict between them. *Id.* at 698. In support of this argument, Heather relies on text messages and emails between the parties that she says show their "struggles with communication, lack of trust, and lack of respect." There are a few text messages and emails that show communication problems, but they are not pervasive. On the whole, the parties' written communication with one another was mostly respectful and showed an ability to set aside their differences for the children. But conflict remained in their personal interactions, with Shaun testifying: "[M]e and her don't get along. We never have really from the start. We don't see eye-to-eye on a lot of decisions." *See id.* ("[T]he degree of conflict between parents is an important factor in determining whether joint physical care is appropriate.").

Heather described Shaun's behavior as "explosive" at times. There were several occasions when Shaun got upset and threw things, one time a backpack that hit the parties' oldest child in the hand. Shaun also had an encounter with the owner of the children's daycare that almost led to him being banned from the premises. On another occasion, about six months into their separation, Shaun saw Heather's truck in the parking lot of a bar early one morning on his way home from Kansas City. He tracked down the bar's manager, asking her questions about who Heather had been with and wanting to see footage from the bar's security cameras. Heather was upset by this, as well as by Shaun visiting her work unannounced on a couple of occasions. She described Shaun as controlling. Shaun did not necessarily disagree with that description, testifying he could be "overbearing" and "pretty particular about stuff." *See id.* ("Evidence of controlling behavior by a spouse may be an indicator of potential problems.").

Though these are not the most severe instances of conflict we have seen in custody cases, they are enough to tip the scales toward physical care with Heather when combined with her role as the children's primary caretaker during the marriage. *See, e.g., In re Marriage of Thompson*, No. 17-0481, 2017 WL 6026727, at *2 (Iowa Ct. App. Nov. 22, 2017) (finding joint care not in children's best interest where "[a]pproximation heavily favors awarding [one parent] physical care"); *In re Marriage of Garcia Lopez*, No. 16-0915, 2016 WL 6269895, at *2 (Iowa Ct. App. Oct. 26, 2016) (same); *O'Brien v. Wygle*, No. 13-1210, 2014 WL 1714956, at *3 (Iowa Ct. App. Apr. 20, 2014) (same). We have also considered Shaun's testimony about why he was seeking joint physical care, which focused on himself rather than the children. When asked, "Do you believe it's in the best interests of your children as well as in their long-range interests for you and Heather to be awarded joint physical care," Shaun responded: "I think it should be fair down the middle." But physical care decisions "are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*." *Id.* at 695. So while joint physical care might fulfill Shaun's wish for fairness between him and Heather, we do not believe it's in the children's best interest given the caretaking arrangement in place during the marriage.

We accordingly modify the decree to place the children in Heather's physical care and remand for the district court to establish Shaun's parenting schedule and child-support obligation.

## B.    Property Division

Heather next challenges the district court's property division, focusing on the court's failure to account for Shaun's claimed dissipation of assets. Dissipation

of assets is a proper consideration when attempting to achieve an equitable division of property. *See Fennelly*, 737 N.W.2d at 104. "The dissipation doctrine applies when a spouse's conduct during the period of separation results in the loss or disposal of property otherwise subject to division at the time of divorce." *In re Marriage of Kimbro*, 826 N.W.2d 696, 700–01 (Iowa 2013) (citation omitted). "If improper loss occurs, the asset is included in the marital estate and awarded to the spouse who wasted the asset." *Id.* (citation omitted). But the doctrine "does not apply if the spending spouse used the monies for legitimate household and business expenses." *Id.* (citation omitted). With this framework in mind, and the goal of achieving an equitable distribution, *see Fennelly*, 737 N.W.2d at 102, we turn to Heather's specific dissipation claims.

### 1. Business Asset

Heather first argues the district court's division of the marital estate "failed to account for the value added to the business and Shaun's . . . below-fair-market-value-sale of business to his uncle." The parties purchased the business shortly before their separation in July 2020 for $100,000.00. Heather complains Shaun unilaterally sold the business at the end of December for only $75,000.00, and Melvin's sale of the business just a few days later for $125,000.00 shows Shaun sold it for below market value, thus resulting in a loss to the marital estate of $50,000.00. So she thinks Shaun should be attributed that amount as an asset.

What Heather ignores is that Shaun's decision to sell the business to Melvin led to Melvin waiving the parties' liability for twenty-five months' worth of rent under the shop lease, totaling $62,500.00. As a result, the transaction was more beneficial to the marital estate than it would have been had the business been sold

for the price Heather submits it should have been. We find no inequity to Heather on this point and affirm. *See In re Marriage of Hansen*, 886 N.W.2d 868, 871 (Iowa Ct. App. 2016) ("We will disturb the district court's ruling only when there has been a failure to do equity.").

### 2. Other Alleged Dissipation

Heather next argues Shaun engaged in unnecessary and unexplained spending after the parties' separation. She points to her exhibit 57, and argues Shaun dissipated the marital estate with $7730.13 in "[c]ash withdrawals/ advances"[6] and $40,130.20 in "[l]arge unexplained checks/charges."[7]

A two-prong test is used to assess a dissipation claim. *Kimbro*, 826 N.W.2d at 701. First, the "court must decide whether the alleged purpose of the expenditure is supported by the evidence. *Id.* (citation and internal quotation marks omitted).

> When a spouse claims the other party dissipated assets and can identify the assets allegedly dissipated, the burden shifts to the spending spouse to show how the funds were spent or the property disposed of by testifying or producing receipts or similar evidence. It is not enough for a spouse to merely show the incurrence of expenditures during the period of separation. The spouse also must show a nexus between the payment of the expenses and the use of the marital assets at issue.

---

[6] The exhibit covers $13,730.13 for these items, but Heather agrees the court attributed $6000.00 of this amount as an asset to Shaun for gambling losses.

[7] Heather also notes in her appellate brief that Shaun wrote himself a check for $30,000.00 from the business account for his "investment return" and provided none of those funds to her. On appeal, she requests that this amount be included as an asset to Shaun. The problem is that she did not raise this issue in district court, where her dissipation claim was limited to the amounts identified above, plus the new furniture and appliances Shaun bought when he moved to Iowa. So we cannot provide her with relief on appeal. *See Woods v. Charles Gabus Ford, Inc.*, 962 N.W.2d 1, 5 (Iowa 2021) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." (citation omitted)).

*Id.* (internal citations and quotation marks omitted). If an evidentiary basis for the expense is established, then "the court advances to the second prong, which asks whether that purpose amounts to dissipation under the circumstances." *Id.* (citation and internal quotation marks omitted). This second assessment is based on these factors:

> (1) the proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefited the "joint" marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and the amount of, the expenditure.

*Id.* (citation omitted).

The court based its property distribution upon "what it believe[d] to be the most credible evidence in the record." Of the more than $53,000.00 in assets Heather claimed Shaun dissipated, the court only found $6000.00 in gambling expenses amounted to dissipation. Heather claimed Shaun's spending since separation was extravagant when compared to his spending during the marriage, while Shaun testified his spending was "[n]ot at all different." He added that he "like[s] to have cash in [his] pocket," and would spend it on "little things," gas, food, necessities of life, etc.

The bank records, which show some of Shaun's spending habits before the parties' separation, support Shaun's testimony. *See In re Marriage of Bischof*, No. 12-2005, 2013 WL 4769389, at *5 (Iowa Ct. App. Sept. 5, 2013) (finding spouse's testimony satisfied the burden to show no dissipation of marital assets occurred). We also note that many of the expenses and cash withdrawals were incurred after Shaun relocated to Iowa to be closer to the children. *See In re*

*Marriage of Drenter*, No. 17-1548, 2019 WL 478195, at *2 (Iowa Ct. App. Feb. 6, 2019) ("There are transitional expenses associated with a dissolution proceeding as the parties transition from married life to single life."). While the court did not specifically say so, it is implicit that the court found Shaun more credible. We defer to that credibility finding and, like the district court, find these expenditures do not amount to dissipation. *See Fennelly*, 737 N.W.2d at 100 (giving weight to "trial court's factual findings, especially with respect to the credibility of the witnesses" (citation omitted)).

In this same category, Heather argues that Shaun's liquidation of his 401(k) amounts to dissipation because it resulted in early withdrawal penalties of $7946.26. She complains, absent liquidation, there would have been more in the account to divide. But she never asserted at trial, or on appeal, that she did not want the account to be liquidated and instead transferred to her through a qualified domestic relations order to avoid those penalties. *Cf. In re Marriage of Retz*, No. 11-0447, 2012 WL 3026786, at *2 (Iowa Ct. App. July 25, 2012) ("A balance transfer avoids tax consequences of withdrawing funds from a retirement account."). Though we do not approve of Shaun's unilateral action in cashing out the account in violation of an asset-preservation order, we find no inequity to Heather, especially considering that Shaun was ordered to "pay any remaining taxes owed to the withdrawal."

### 3.   *Purchased Assets*

This leaves us with the property that Shaun purchased post-separation. On that issue, Heather complains the district court's balance sheet did not include those items of property as assets, even though it did include the debt incurred for

buying at least some of those assets as liabilities. She points out that Shaun spent $7198.68 on new furniture, $2448.44 on a stove and fridge, and $1580.77 on a washer and dryer set, none of which was included on his side of the balance sheet as assets. We agree this was inequitable given that the court awarded each of the parties the personal property presently in their possession, determining "that personal property to be of equal value," and there was no evidence Heather bought any personal property comparable in value to the assets Shaun purchased.

For relief, Heather requests either addition of the items as assets or removal of them as debts from Shaun's side of the ledger. Because we have a solid figure on the remaining debt for the furniture bought on the Wells Fargo card, $6898.68 as shown on the court's ledger, we modify the decree to remove that as a debt to Shaun. The remaining furniture and appliances are a little trickier because no debt is linked to those items. Instead, all we have is what was paid for the remaining furniture and appliances, with no used value. According to our review of the evidence, Shaun spent $3535.18 on other furniture and $4029.21 on appliances, for a total of $7564.39. Because these purchases were made close in time to the dissolution trial, we find it is equitable to attribute those amounts to Shaun as an additional asset. We note this is also within the range of the parties' own valuations.[8] With these adjustments, Shaun's asset distribution would increase by $7564.39, and his liability distribution would decrease by $6898.68.

---

[8] In their pretrial filing, Shaun valued the "[p]ersonal property [he] purchased for new residence" at $6500.00, while Heather valued it at $10,000.00.

#### *4.      Attorney Fee Liabilities*

Lastly, Heather challenges the district court's decision to include the $10,000.00 Shaun charged on his credit card shortly before trial for his attorney fees but not include the $10,772.20 she borrowed from her father for her attorney fees. She asks that these debts be treated similarly. We agree that is the equitable thing to do.

"Attorneys' fees incurred in dissolution proceedings are not marital debt." *Hansen*, 733 N.W.2d at 703. So any outstanding debt of either party should not have been included as a marital liability and included in the balance sheet. Clearly, $10,000.00 of the credit card debt assigned to Shaun was a debt stemming from attorney fees. His debt assignment should therefore be reduced by another $10,000.00.[9] This will result in the parties' outstanding attorney-fee liabilities being "similarly" treated as personal liabilities outside the marital estate. *See id.*

#### *5.      Recalculation*

For these reasons, Shaun's assets assignment would be increased by $7564.39, and his liability assignment would be decreased by a total of $16,898.68. These adjustments increase Shaun's equalization payment to a final amount of $12,745.49. We modify the decree accordingly.

#### C.      Trial Attorney Fees

Heather relatedly argues the court erred in denying her request for an award of trial attorney fees of $18,089.70. But her request is conditioned on our court declining to modify the property distribution to treat the parties' outstanding

---

[9] Heather asks that the entirety of that credit card debt be wiped, but it only appears $10,000.00 was attributable to attorney fees.

attorney fees similarly. Because we are modifying the dissolution decree in that manner, the condition Heather puts on her request is not triggered. So we affirm on this point.

### D. Appellate Attorney Fees

Finally, Heather requests an award of appellate attorney fees of $23,730.00. An award of appellate attorney fees is not a matter of right but rests within the appellate court's discretion. *Berning*, 745 N.W.2d at 94. The court considers "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005) (citation omitted). Both parties have similar incomes, and the costs of this litigation no doubt ate up most, if not all, of the liquid value of the marital estate. We accordingly decline Heather's request, even though she was partially successful on appeal. The costs of the appeal are assessed against Shaun.

## IV. Conclusion

We modify the dissolution decree to place the parties' children in Heather's physical care and remand to establish Shaun's parenting schedule and child-support obligation. We also modify the property distribution as detailed above, increasing Shaun's total equalization payment to $12,745.49. With equitable treatment of the parties' attorney-fee liabilities, we affirm the denial of trial attorney fees to Heather. We also deny Heather's request for appellate attorney fees, but we assess the costs of the appeal against Shaun.

**AFFIRMED AS MODIFIED AND REMANDED.**